CASE 61.—ACTION BY JOHN H. WILSON AGAINST JAMES BOREING AND OTHERS FOR A SETTLEMENT OF PARTNERSHIP ACCOUNTS IN WHICH M. J. MOSS JOINED BY ANSWER COUNTERCLAIM AND CROSS PETITION.—March 25.

## Boreing, &c. v. Wilson, &c.

Appeal from Bell Circuit Court.

JOHN McCHORD, Special Judge.

From the judgment, defendants except Moss, appeal —Affirmed.

1. Judges—Disqualification to Act—Association with Attorney for One of the Parties in Another Case.—The facts that a special judge is counsel for a railroad, and that another attorney, who is his superior in authority in the same employment, was attorney for one of the parties in a former action, and therein

Boreing, &c. v. Wilson, &c.

showed his personal hostility toward defendant's interests, are not sufficient to disqualify the judge.

2. Same—Interest in Possible Future Litigation.—The facts that a special judge was counsel for a railroad which might be involved in litigation in respect to land in controversy in the instant case, and in case of such litigation the judge might not impartially decide the matters involved in the instant case, are not sufficient to disqualify the judge.

3. Same—Social Favoritism.—It is only judicial favoritism that disqualifies a judge, and mere personal or social favoritism shown a party or his attorneys is not sufficient.

4. Same.—The fact that in a former hearing of an application for the appointment of a receiver of the property in controversy in the instant case, where evidence was heard upon the question whether a partnership existed, the judge, after deciding that a partnership did exist, expressed his satisfaction with the proof on that issue and complimented the attorneys on the other side for their presentation of their case, did not prejudice the issue of the existence of the partnership, which was the main issue in the instant case to settle partnership accounts, so as to disqualify him from further service as judge in the case.

5. Same—Intention to Appoint Prejudiced Commissioner.—The fact that a judge intended to appoint as commissioner to hear proof and settle partnership accounts a person prejudiced against one of the parties and in favor of another, while good cause for objection to the commissioner's appointment, is no ground for disqualification of the judge.

6. Same—Sufficiency of Affidavit.—An affidavit that a judge is disqualified to act must set forth the facts upon which the general allegation is made, and mere inferences, suspicions, and conjectures are not sufficient.

7. Appeal—Review—Scope—Rulings Against Party Not Appealing.—On appeal by the unsuccessful parties, where no cross-appeal was taken by the two successful parties, in a controversy over their transaction with a deceased person, the ruling of the court that neither one of them could testify for the other as to what was said or done by or with decedent need not be reviewed.

8. Partnership—Sharing Profits—Evidence.—While profit sharing is not a conclusive test of partnership, it is important as evidence tending to prove the relation, as an agreement to share profits is an essential element of every partnership, and its absence is conclusive that a partnership does not exist.

9.  Same—Mutual Agency.—Mutual agency is not a test of part-
nership, since agency results from partnership, and not part-
nership from agency; and though the absence of mutual
agency is a circumstance to be considered, it is not conclusive
proof that a partnership does not exist.

10.  Same—Intention of Parties.—The intention of the parties is
the controlling element in deciding whether a partnership
exists, and if they by their acts, conduct, and writings show
that they intended a partnership, and did in fact agree to
share the profits of the business as joint owners, they are
partners.

11.  Same—Existence of Relation—Evidence.—Evidence exam-
ined, and held to show that a partnership existed among
certain persons.

12.  Witnesses — Competency — Transactions with Person Since
Deceased.—A defendant in a proceeding to settle partnership
accounts, who had received machinery from one of the part-
ners, since deceased, may testify for the adverse party that
he purchased the machinery from decedent at a certain price,
where the only question involved was whether he paid a
certain sum to decedent for the machinery, and the recovery
of the machinery was not an issue; Civ. Code Prac. section
606, subd. 2, providing that no person shall testify for him-
self concerning any transaction with one who is dead, etc.,
and subd. 7, providing that the assignment of a claim by a
person who is incompetent to testify for himself shall not
make him competent to testify for another, not being appli-
cable.

13.  Partnership—Settlement—Evidence.—In a proceeding to set-
tle° partnership accounts evidence examined, and held to
warrant a charge against the estate of a deceased partner for
500 acres of partnership land sold by him at $40 per acre.

14.  Same—Application of Payments for Land Partly Belonging
to Firm.—Where a partner sold land owned partly by the
firm and partly by himself, and received in stock and cash an
amount in excess of the price of the firm land, but less than
the price of the entire tract, good faith requires that the
payments should be applied on the debt due upon the partner-
ship lands before applying any of it to that owned by the
partner individually.

15.  Same—Sale of Firm Land by Partner for Stock—Payment of
Purchase Price to Firm.—Where a partner sells firm land
as his own, takes stock in part payment, and converts it to
his own use, upon settlement of the partnership accounts

12 years thereafter, the firm will not be required to take any part of the stock as payment for the firm land.

16. Same—Accounts. Between Partner and Firm—Mutual Accounts.—A partner agreed to advance to his firm money needed for the purchase of land, expenses of business, etc., and he was to receive interest on advancements made. He also received and retained sums of firm money, the proceeds of sales of the land negotiated by him. Held, that the accounts between him and the firm, showing the amounts advanced by him and the amounts received by him from the sales of firm property negotiated by him as trustee, constituted, not a case of partial payments, but one. of mutual accounts of equal rank, and the same rate of interest should be allowed upon the proceeds of sales of firm property while in his hands as upon advancements made to the firm.

17. Trial—Submission "for Hearing and Trial in Chief"—Power of Court.—In a proceeding for the settlement of partnership accounts, where the case was submitted on exceptions to certain depositions and "for hearing and trial in chief," the court, without any agreement between counsel, could take up and pass upon the controversy relating to certain items, without referring them to a commissioner to hear proof and report thereon.

18. New Trial—Additional Evidence—Sufficiency of Affidavit.— Affidavits for a new trial on the ground of certain facts, some of which were recited in a deed, which do not show any reason why the evidence could not be secured in time for the final hearing, nor why a copy of the deed, which was on record, was not secured for the hearing, are insufficient.

D. B. LOGAN for appellants.

GREENE & VANWINKLE of counsel.

POINTS BRIEFED AND AUTHORITIES CITED.

1. The Honorable John McCord, special judge of the lower court, is disqualified from hearing or trying the case by the affidavit of John R. Boreing, one of the defendants, filed with the clerk of the lower court, July 28th, 1904, as appellants contend. (Vance v. Field, 89 Ky., 179; Chenault, etc. v. Spencer, etc., 24 Ky. Law Rep., 142; Massie v. The Commonwealth, 93 Ky., 588; Givens v. Crawshaw, 21 Ky. Law Rep., 1619.)

2. A. H. Melcon's testimony as to his alleged purchase of the

machinery on the Tuckehoe lease is incompetent against the appellants who are heirs and devices of Vincent Boreing, deceased. (Civil Code, sec. 606, subsec. 2; Elliott on Evidence, vol. 11, sec. 737; Alexander v. Alford, 89 Ky., 105; Weinstein v. Patrick, 75 N. C., 344; Hubble v. Hubble, 22. Ohio St. Rep., 208; Whitlow's Admr. v. Whitlow's Admr., 109 Ky., 573.)

3. No partnership relation is established by the record to have existed between Vincent Boreing and the appellees, Wilson and Moss, but one of trust only. Both mutual agency among the parties as well as community of interest in the property in the lands in controversy between the alleged partners are shown to have been wanting. George on Partnership, p. 3; Parson on Contracts, vol. 1, 7th Ed., 177-8 (bottom); Ibd. (Footnote); Page on Contracts, vol. II, sec. 940, p. 1472; Beecher v. Bush, 45 Mich., 188; Colwell v. Britton, 26 N. W. Rep., 583; Kellogg Newspaper Co. v. Farrell, 88 Mo., 594; Bates on Partnership, vol. 1, sec. 23, p. 26; Ibid. vol. 1, pp. 37-38; Ibid. vol. 1, sec. 37, p. 51; Elliott on Evidence, vol. III, sec. 2553, p. 1054; Lindley on Partnership, 2d Ed., vol. I, pp. 15-17; Vanderburg v. Hull, 20 Wendell, 70; Harvey v. Child, 28 Ohio, 319; Campbell v. Dent, 54 Mo., 325; Adams v. Funk, 52 Ill., 299; Wells v. Babcock, 52 Mich., 276; Hazard v. Hazard, 1st Story, 371; Johnson v. Miller, 16 Ohio, 431; 63 U. S., 22 Howard, 333; Meehan v. Valentine, 145, U. S., 611; Ibid. 145 U. S., 611; Webster v. Clark, 22 L. R. A., 129; Berthold v. Goldsmith, 65 U. S., 536; Seymour v. Freer, 75 U. S., 202; Am. & Eng. Enc. of Law, 2d Ed., vol. XXVIII, p. 858; Ibid. 2d Ed., Vol. XXVIII, p. 879; Ibid. 2d Ed., vol. XXVIII, p. 887; Ibid. 2d Ed., vol. XXVIII, p. 955; Ibid. 2d Ed., vol. XXIII, p. 993; Parson on Contracts, 7th Ed., vol. 1, pp. 177-178 (bottom.)

WILLIAM AYERS and J. R. SAMPSON for appellees.

TOPICS AND CITATIONS.

1 The testimony of Moss and Wilson, each for the other, is competent, and the lower court erred in holding otherwise. (Civil Code, 605, 606; Beach's Admr. v. Cummins' Ex't'v, 13 Ky. Law Rep., 881; Story et al. v. Story's' Exr., 22 Ky. Law Rep., 1731; Dovey v. Lam, etc., 25 Ky. Law Rep., 1157; Schonbachler's Admr. v. Mitchell, etc., 28 Ky. Law Rep., 460.)

2. Under the law applicable to the facts in this case, a partnership is proven to have existed between the appellees and Vincent Boreing, and the lower court properly so adjudged.

Boreing, &c. v. Wilson, &c.

(22 A. & E., 2d Ed., pp. 77, 79, 80, 93, 98, 13, 22, 23, 24, 25, 27, 28, 29, 30, 34, 40, 42, 44, 46, 47, 54, 65, 71, 100, 101, 102 and 114; Dutcher v. Buck, 96 Mich. 160, 20 L. R. A., 776; Ward v. Thompson, 63 U. S. (22 Howard) 333; Berthold v. Goldsmith, 65 U. S., 536; Seymour v. Freer, 75 U. S., 202; Tyler v. Waddingham, 58 Conn. 375, 8 L. R. A., 657; Richards v. Grinnell, 63 Iowa, 44; Re Gibbs Estate, 157 Pa. 59, 22 L. R. A., 281; Carter v. McClune, 98 Tenn. 109, 36 L. R. A., 282; Webster v. Clark, 34 Fla. 637, 27 L. R. A., 126; Shrum v. Simpson (Ind.), 49 L. R. A., 794; Flower v. Barnekoff (Oregon), 11 L. R. A., 149; Stuart v. Harmon, 24 Ky. Law Rep., 1829.)

3. Respecting the item of $3,000 paid to Boreing by defendant Melcon for the purchase of certain machinery, the lower court properly held that same should be charged against Boreing's estate, and that the testimony of Melcon in reference to said purchase and payment is competent. (Civil Code, secs. 605, 606; Beach v. Cummins, Story v. Story, Dovey v. Lam, and Schonbachler v. Mischell heretofore cited; also, Western District Warehouse Co. v. Hayes, 97 Ky., 16.)

4. Respecting the item of $20,000, for sale of 500 acres of partnership land by Boreing to Bell County Coke and Improvement Company, the lower court properly held that same should be charged against Boreing's estate as of March 25, 1890, as the valuation of the land taken by Boreing from the firm and sold by him to that company for his individual benefit. (22 A. & E., 1st Ed., p. 1086; Lindley, Partnership, p. 568 (side page 236); Russell v. Green, 10 Conn., 269.)

5. The lower court, having allowed interest to Boreing on his advances at the rate of eight per cent., according to the agreement proven, properly directed that he be charged with like interest on receipts, to date of settlement by the Commissioner, including said two items of $3,000 and $20,000. (Lindley on Partnership, side pp. 389, 390, 391, 392, and notes, top pp. 924, 925 (note); Green's Exr. v. Watkins, 1 Ky. Opinions, 430; Masonic Bank v. Bang's Admr., 10 Ky. Law Rep., 743; Joplin v. Cordrey, 9 Ky. Law Rep., 448; Burgher v. Burgher, 12 Ky. Law Rep., 95; Thomas v. Winchester Bank, 20 Ky. Law Rep., 1503 (105 Ky., 694); Bates on Partnership, vol. 1, sec. 313, vol. 2, sec. 782; Wells v. Babcock, 56 Mich., 276; Dimond v. Henderson, 47 Wis., 172; 22 A. & E. 2d Ed., pp. 115, 127; Perry on Trusts, vol. 2, sec. 821; Hume v. McNees, 10 Ky. Law Rep., 947; George on Partnership, p. 170 (note).

6. The lower court properly overruled the motion of appellants to set aside portions of the judgment respecting said items of

$3,000 and $20,000, and to refer same to the Commissioner for further proof.

7. The special judge properly declined to vacate the bench, the affidavit of John R. Boreing therefor not being in time and being otherwise insufficient. (Massie v. Com., 93 Ky., 588; Givens v. Crawshaw, 21 Ky. Law Rep., 1619; Chenault v. Spencer, 24 Ky. Law Rep., 142; Smith v. Com., 21 Ky. Law Rep., 1470; Sparks v. Colson, 22 Ky. Law Rep., 1369; French v. Com., 97 S. W., 427; Schmidt v. Mitchell, 19 Ky. Law Rep., 770; Powers v. Com., 24 Ky. Law Rep., 1017; German Ins. Co. v. Landrum, 88 Ky., 433.)

· OPINION OF THE COURT BY WM. ROGERS CLAY, COMmissioner—Affirming.

In the spring of the year 1886 appellee John H. Wilson was engaged in the practice of law in Barbourville, Knox county, Ky. His services were secured by the Louisville & Nashville Railroad Company after that corporation had decided that it would construct a branch railroad from Corbin, on the main line of its Knoxville division, up the Cumberland river, into the coal fields of Bell and Harlan counties, or through Cumberland Gap into the coal fields of Wise and Lee counties, Va. After appellee Wilson had learned that the road would be constructed, he could readily see that the coal-bearing properties along the line of the proposed road would of necessity rapidly advance in price, and that the purchase of the lands at the low prices then prevailing, and before it became known that the road would be constructed, would prove a very profitable investment. Appellee had formed the acquaintance of his coappellee, M. J| Moss, some time prior to 1886, who was engaged in the practice of law in Bell county, and was well acquainted with the inhabitants of that county, and especially the landowners along the line of the proposed railroad. Ac-

cordingly they agreed to go into an arrangement by which they would purchase lands and hold them until the prices advanced. Realizing that it would take a large sum of money to carry through the enterprise, they then proposed to Vincent Boreing, a wealthy and influential man in that section of the State, to join the enterprise. It was agreed between the parties to the arrangement that whatever cash was advanced or furnished by either was to be returned to him, with interest, and the profits were then to be divided equally among them. In pursuance of this arrangement about 5,000 acres of land were purchased. Frequently Moss or Wilson would propose that they get together and draw up a contract accurately defining the rights of each party to the lands in question. Sometimes Boreing would make the same proposition. No such contract, however, was ever signed. The matter was permitted to drag along from year to year, and finally, in the year 1903, Vincent Boreing died.

Thereafter appellee Wilson filed his petition in the Bell circuit court, alleging the existence of a partnership between him, Moss, and Boreing. To this petition appellee Moss and the heirs, devisees, and personal representatives of Vincent Boreing were made defendants. The petition, after setting forth the death of Boreing, the dissolution of the partnership by reason thereof, and the qualification of his administrators under the will, alleges that it was agreed at the inception of the partnership enterprise that Vincent Boreing should furnish the money necessary to acquire the lands, and that he (Wilson) and Moss should contribute in aid of the enterprise their services and assistance, and, when the land was sold, Boreing should receive the various sums of money which he had advanced from time to time in making

the necessary purchases, as well as all reasonable and necessary expenditures in connection therewith, together with 7 per cent. interest on said sums of money from the time of their payment by Boreing. The petition further states that it was also agreed that he (Wilson) and Moss should, out of the proceeds, receive from time to time such money, with a like rate of interest thereon, as either of them might have contributed or paid out towards the purchase of said lands, in surveying expenses or other expenses incurred in the acquisition of title thereto; that Boreing had paid on said lands $30,000 or $35,000, that he (Wilson) had paid $2,000 to $2,700, and that Moss had paid $7,000 or $8,000; but that the exact amount that each had paid was unknown to appellee. Appellee then asked a settlement of the partnership accounts and a reference to the master commissioner for that purpose.

To appellee Wilson's petition, appellee Moss, on December 7, 1903, filed his answer, counterclaim, and cross-petition, making appellants cross-defendants, and joined in the prayer Wilson for a settlement of the partnership accounts. Appellee Moss also set forth in his answer and cross-petition the unsettled and uncertain state of the partnership accounts, as well as the fact that Boreing had furnished in the purchase of the lands $30,000, but that the exact amount was unknown to appellee. He also alleged that he had paid in about $7,500, but that Wilson had paid in only about $1,475. Both the petition of appellee Wilson and the answer and cross-petition of appellee Moss alleged that Boreing had received large sums of money in the way of rents and proceeds from the sale of lands and timber involved in the controversy, the exact amount of which they did not

know.  Among other items they alleged that Boreing had received $20,000 for 500 acres of land which was sold by him out of the partnership property to the Bell County Coke & Improvement Company, and that he had also received $3,000 for certain machinery on the Tuckehoe lease which he had sold to A. H. Melcon.

On January 13, 1904, the appellants herein filed their answer to the original petition of appellee Wilson, and also their reply to the answer, counterclaim, and cross-petition of appellee Moss, denying and putting in issue every material allegation of those pleadings.  Thereafter certain amended pleadings were filed, and, among them, one by appellee Wilson asking for the appointment of a receiver to take charge of the property during the litigation.  Responsive pleadings were then filed and the issues joined on all the material allegations of the several amendments.  The court appointed a receiver, who qualified and is now in charge of the property.  The parties then proceeded with the taking of testimony, and the special judge, Hon. John McChord, called a special term of the court in the month of July of that year, at which to hear the case.

On July 28, 1904, one of the administrators, John R. Boreing, presented and filed his affidavit with the clerk of the Bell circuit court, in which he claimed that appellants could not get a fair trial of their cause before said special judge.  The latter decided that the affidavit was insufficient and declined to vacate the bench.  After this affidavit was filed, the case was continued to the October term for further preparation, and was then submitted and tried.  The court held that a partnership existed between Wilson, Moss, and Boreing; that in the settlement Vincent Boreing's estate should be charged with the sum of $3,000

for the machinery sold to A. H. Melcon, with 8 per cent. interest on said sum from the time the money was paid; that said Boreing's estate should be charged with the further sum of $20,000 for the land sold by Boreing to the Bell County Coke & Improvement Company, with 8 per cent. interest thereon from the time of the receipt of said sum by Vincent Boreing. On October 29, 1904, the court entered a judgment in accordance with his conclusion set out above. After the entry of this judgment, appellants filed their written motion asking the court to set aside certain parts thereof, and in support of the motion filed certain affidavits, together with the deed of conveyance executed by Vincent Boering on the 23d day of May, 1890, to the Bell County Coke & Improvement Company. Upon the hearing of appellant's motion the court refused to set aside any portion of the judgment entered. Of the judgment and of the refusal of the trial court to set certain portions thereof aside, appellants now complain.

This appeal involves the determination of the following questions: (1) Did the special judge err in refusing to vacate the bench? (2) Did the transaction between appellees and Vincent Boreing constitute a partnership? (3) Was A. H. Melcon, who purchased the machinery on the Tuckehoe lease, competent to testify for appellees, and did the court err in charging the estate of Vincent Boreing with the sum of $3,000 paid by said Melcon for said machinery? (4) Did the court err in charging the estate of Vincent Boreing for the 500 acres of partnership land sold by Boreing to the Bell County Coke & Improvement Company, and fixing the sum to be charged at $20,000? (5) Did the court err in charging the estate of Vincent Boreing interest at the rate of 8 per cent. on said sums

of $3,000 and $20,000 from the time said sums were received by him? (6) Did the lower court properly overrule the motion of appellants to set aside those portions of the judgment respecting said items of $3,000 and $20,000, and to refer same to the commissioner for further proof?

First. On July 28, 1904, appellant John R. Boreing, for himself and his coappellants, filed the following affidavit, in which he set forth legal grounds why the special judge should vacate the bench:

"The affiant, John R. Boreing, says that he is one of the defendants in the above styled cause, and is the only one taking an active interest in the defense herein; that his codefendants, Julia T. Williams, Sallie Boreing, Belle Young, James M. Boreing, May Melcon, and this affiant are the only devisees of Vincent Boreing, deceased. The other defendants, to wit, A. H. Melcon, J. M. Williams, and Joseph Young are nominally defendants only, the husbands of affiant's married sisters. This affiant says he does not believe Hon. John McChord, the special judge appointed and commissioned herein to try this cause, by Hon. J. C. W. Beckham, Governor of the Commonwealth of Kentucky, can or will give these defendants a fair and impartial trial of the issues herein, or that he can or will impartially try and decide the issues between the plaintiff, J. H. Wilson, and the cross-plaintiff, M. J. Moss, on one side, and these defendants, the brother and sisters of this affiant and himself, on the other. This affiant's belief is based upon the following grounds: He says that since the last term of this court he has learned, and he avers it to be true, that the said special judge, John McChord, is an attorney and representative of the Louisville & Nashville Railroad Company, a corporation owning and operating a line

of railroad through Bell county, Ky., and through several other counties in the State of Kentucky, with its chief office at Louisville, Ky., which line of railroad extends through Marion county, Ky., in which said special judge resides; that one J. W. Alcorn is likewise an attorney and representative for said Louisville & Nashville Railroad Company, and as such superintends, conducts, and has charge of the litigation in which said railroad company is involved from Louisville, Ky., to Cumberland Gap, and has the right to direct and does direct and superintend and advise other attorneys engaged in the service of said Louisville & Nashville Railroad Company, from Louisville to Cumberland Gap, including said special judge, John McChord; that the cross-plaintiff, M. J. Moss, is the regular circuit judge of the Twenty-Sixth judicial district, of which district Bell county is a part, and that the said J. W. Alcorn practices law in the said Twenty-Sixth judicial district and in the Bell circuit court, giving his attention almost exclusively to the litigation of said Louisville & Nashville Railroad Company; that he, the said J. W. Alcorn, likewise practices in the Laurel circuit court, where this affiant and his brother and sisters live; that the affiant, as president of the Bell Coke & Improvement Company, which is the owner of a part of the property claimed in the pending controversy to have been once owned by the alleged partnership alleged to have existed by and between the decedent, Vincent Boreing, the plaintiff, John Henry Wilson, and cross-plaintiff, M. J. Moss, has caused an action to be instituted in the Laurel circuit court to recover of the said M. J. Moss $500 alleged to be due said company on the subscription of said Moss to its capital stock; that the said J. W. Alcorn is one of the attorneys of said Moss in said

action, and that, although he does not sign the plead-
ings as attorney, he in everything else represents said
Moss as attorney in said cause, withholding his name
from the pleadings. He aided in the preparation of
the answer of said Moss in said cause while in Bell
county, and prepared an affidavit of said Moss for
delay in said cause, and presented and filed it in the
Laurel circuit court, making at the time a speech to
the court which plainly showed his personal animosity
toward the affiant, and that the said J. W. Alcorn
has on several other occasions manifested his inclina-
tion to be strongly adverse to the welfare of the estate
of Vincent Boreing, and that he has without fee or
compensation on several occasions opposed the suc-
cessful winding up of said estate, and has on each and
every occasion shown his bitter personal dislike and
antagonism for and toward the said estate and those
representing it and this affiant; that said Alcorn is
a very warm personal friend of the said M. J. Moss,
the said judge of the Bell circuit court, and his in-
fluence over the said judge is such that in litigation in
said court in which said company is involved and
wherein said Moss presides as judge the railroad com-
pany wins almost uniformly and the opposing liti-
gants lose; that said company owns and maintains a
branch of its railroad through Bell county, and has
various shops and its superintendent's division
therein; and that it has almost continuous litigation
in the Bell circuit court.

"Affiant further says that the said Louisville &
Nashville Railroad Company, under contract with
three of the lessors of the property in controversy in
this action, has built a spur or a short railroad from
the Louisville & Nashville main track at Four Mile,
Ky., up Four Mile creek, and through and over the

property in controversy, and that the continuance of its operation is made to depend upon contingencies regarding the successful operation of said property as a coal-mining property, and most especially· upon the construction of ambiguous contracts with the said Louisville & Nashville Railroad Company regarding the construction·of said spur or branch railway, which ambiguous contracts this affiant believes and avers will before the termination of this suit·be litigated in this very action, in order to· establish the relative rights of the said Louisville & Nashville Railroad Company and this affiant·and his·brother and sisters, the heirs and devisees of said Vincent Boreing, in, to, and concerning said spur or branch railway up Four Mile creek. Affiant further· says that the said spur or branch railway.has not been fully paid for by the said lessors of the. property or the property owners, and that there will probably arise in this very suit a controversy between this affiant and the other heirs and devisees of Vincent Boreing and the plaintiff, John Henry Wilson, and the cross-plaintiff, M. J. Moss, and the said Louisville & Nashville Railroad Company over the construction of said spur or branch railway, and the amount of its cost and construction, and the manner of payment of same; and this affiant believes that an attorney for the Louisville & Nashville Railroad Company could not, as judge in this case, wherein the interests of the said Louisville & Nashville Railroad Company will probably become adverse to this affiant and his brother and sisters, who claim in this action to be the sole owners of the property in controversy, impartially or fairly decide this controversy and the issues which may place the said Louisville & Nashville Railroad Company in a more advantageous position when said controversy between

them and this affiant, his brother, and sisters, arises, and in which the said special judge, John McChord, as a servant and attorney of said railway company, will, as affiant believes, be interested, and will desire a coalition of the interests of said company and the interests of the plaintiff, John H. Wilson, and cross-plaintiff, M. J. Moss, and especially that of the said Moss, because of his official position and power as circuit judge; that personally and socially the said special judge has shown toward the plaintiff, Wilson, and the cross-plaintiff, Moss, and his attorneys, J. R. Sampson and William Ayers, special favoritism, and has seemingly on the other hand, in minor matters in this cause given these defendants no quarter in this proceeding up to the present time.   And this affiant is informed, and believes and avers, that said judge has repeatedly stated and declared to persons outside of the courthouse and in private conversations that he had no doubt of the existence of a partnership between the decedent, Vincent Boreing, the cross-plaintiff, M. J. Moss, and the plaintiff, John H. Wilson, and that he had become satisfied of this fact before he had heard half of the testimony on the plaintiff's application for receiver tried last January.   The main and about the only question to be tried in this cause, and the only issue of any importance, is whether or not a partnership actually existed between said parties. Whether or not a partnership was ever formed or ever existed is the vital issue in this cause, and this affiant and his brother and sisters feel that this issue cannot be fairly or properly tried by a judge who has already formed and expressed his opinion that such a partnership did exist.  That affiant, just after the trial of the motion for receiver herein tried at the January term, 1904, of this court, at the Edwards House, in Pineville,

Ky., heard the said special judge, John McChord, congratulate said William Ayres, attorney for plaintiff, Wilson, upon his able presentation of the grounds and cause made for receiver in this cause, and in his congratulatory address to said Ayres he said that before said Ayres was half through the presentation of his side he (said McChord) was of the opinion that a partnership in fact did exist between the decedent, Vincent Boreing, the plaintiff, John H. Wilson, and the cross-plaintiff, M. J. Moss, and that a receiver should be appointed therein on that ground to take charge of the partnership property, and when said Ayres had finished his speech he was conclusively convinced of the same. Said judge was thanked very much for the compliment by said Ayres in graceful terms, and this affiant was informed and believes that said special judge made similar statements at other times and to other persons regarding this case.

"Affiant further says that he is reliably informed and believes it to be true that the said special judge, John McChord, has been approached for the purpose of having C. W. Metcalf appointed special commissioner in this cause for hearing proof and settling the alleged partnership accounts between the plaintiff, Wilson, the cross-plaintiff, Moss, and Vincent Boreing's estate, and that said judge has promised to make said appointment in event it is determined by his (the said special judge's) decision that a partnership ever existed between said plaintiff, Wilson, cross-plaintiff, Moss, and Vincent Boreing, and that affiant believes that said special judge has already, from his expressions of opinion made outside of the court and in conversations, determined to adjudge, and decide that said partnership did exist, and that the appointment of Metcalf is to follow as one of the steps in

this case. Said C. W. Metcalf is also a practicing
attorney in the Bell circuit court, and is the attorney
for the Louisville & Nashville Railroad Company in
Bell county, Ky. He was a bitter political enemy of
the late Vincent Boreing in his lifetime, and carried
said political feeling so far that it became personal
hate and malice. The said Metcalf is also governed
and controlled as attorney for the Louisville & Nash-
ville Railroad Company by J. W. Alcorn. Upon the
recommendation of the cross-plaintiff, M. J. Moss, and
in possession of a letter from said Moss to the Gov-
ernor of the Commonwealth of Kentucky in February,
1904, the said Metcalf on a personal call to said Gov-
ernor was appointed special judge of the Twenty-
Sixth judicial district of Kentucky to hold the Feb-
ruary terms of the Letcher and Perry circuit courts,
while the cross-plaintiff, Moss, was in Bell county
preparing this case for trial, and giving his own depo-
sition as a witness. Metcalf, as affiant believes, cannot
but feel that he owes favors to the said cross-plaintiff,
Moss, for these acts performed in his favor, enabling
him to become special judge as aforesaid. In addition
to these facts the said Metcalf, like other lawyers
employed for the Louisville & Nashville Railroad
Company, desires that the interests of judges and
other officers of courts charged with duties in the ad-
ministration of justice and the Louisville & Nashville
Railroad Company shall not run counter to each other,
but act in harmony and for each other's mutual assist-
ance and benefit. Affiant does not believe said Met,
calf, under such circumstances, would be a proper
person to hear proof, or could fairly decide upon
matters of account in this case, and that said judge
has determined to appoint him. Affiant has learned

these facts since the last term of court and within the last week.

"The application for the appointment of receiver was tried when the defendants had no time or opportunity for preparation of the defendants' side of the case, and at a time when defendants' attorneys's (D. B. Logan's) office had just been destroyed by fire, and his office furniture, books, and papers turned upside down in a heap, and said attorney overworked and illy prepared for the presentation of a defense to the motion. These facts were known to the judge, as well as to the plaintiff, Wilson, and cross-plaintiff, Moss, and their attorneys, and the necessity for a receiver, affiant believes, was wholly lacking, and that his appointment was improvident, and entails cost alone, without benefit, to the owners of the property in controversy; and that the application for a receiver was made alone to annoy the defendants and this affiant. This affiant expects to file grounds and make a motion for continuance of this cause to enable defendants to prepare this cause for trial. The grounds and reason for the motion will be fully stated in the affidavits in support thereof, and this affiant does not believe that the present special judge, Hon. John McChord, will impartially or fairly try or decide the said motion because of reasons hereinbefore stated. Affiant says the foregoing statements are true as he verily believes.

"Wherefore this affiant and his codefendants ask that upon consideration of these reasons the special judge decline to hear or try further motions herein, or to try this case, and for other proceedings according to law and the practice of this court."

Passing the question whether or not this affidavit was filed in time, we will proceed to the discussion of

the grounds relied upon. It will be observed that the first point relied upon by appellant John R. Boreing in his affidavit is that both the special judge and J. W. Alcorn are attorneys for the Louisville & Nashville Railroad Company; that Alcorn is superior in authority to the special judge, and has been indirectly assisting appellee Moss in an action brought against him by the Bell County Coke & Improvement Company to recover $5,000 alleged to be due by him on a subscription to its capital stock; that Alcorn in a speech in that case had shown personal hostility towards the affiant and an inclination to be strongly adverse to the welfare of the Vincent Boreing estate. These might be reasons why J. W. Alcorn, if appointed special judge, should not act; but we cannot conclude, merely because the special judge and J. W. Alcorn happened to be attorneys for the same railroad, though living in different parts of the State, that whatever hostility J. W. Alcorn had would be transferred to the special judge. By such allegations no hostility on the part of the special judge is shown, but a mere probability that the hostility of a co-employe of the same railroad might be imparted to the special judge.

The second point is that the Louisville & Nashville Railroad Company, under contract with certain lessors of coal lands in controversy in this action, had built a spur track up Four Mile creek, and it was possible that litigation might arise with that railroad in connection with those matters, and, if such controversy should arise, the special judge would not impartially or fairly decide the matters involved in this litigation. If a reason such as this were sufficient to require a special judge to vacate the bench, we doubt if any special-judge would ever be able to preside in a case

which he was appointed to try. This allegation contains no fact showing hostility, prejudice, or bias, but sets forth a mere conjecture that by some possibility, nebulous and remote, there might arise in the future— no one knows when—a controversy, either in this action or in some other, between the Louisville & Nashville Railroad Company and the appellants and appellees respecting that railroad spur. Because of that remote contingency, we are asked to conclude that the special judge was disqualified from sitting in this case. It is hardly necessary to say that such an allegation states no grounds disqualifying the special judge. The mere statement of the proposition carries with it its own refutation.

The next point is that the special judge had shown favoritism, both personally and socially, towards appellees Moss and Wilson and their attorneys. This is not the kind of favoritism that disqualifies a judge from acting. It is only judicial favoritism that disqualifies a judge. The time has not come in this State when the ordinary courtesies and amenities of life are to be dispensed with. From time immemorial it has been customary for visiting judges to be entertained by members of the bar. Wherever a judge is called, there are necessarily some lawyers with whom he is on terms of intimacy more or less pronounced. The fact that he seeks the company of those who are most congenial cannot be construed as an evidence of judicial corruption. It is no infrequent thing for members of the bar throughout this State, who practice before this court, to be entertained by members of the court while in attendance thereon; and we may further say it not infrequently happens that immediately after a visiting practitioner before this court has been thus entertained his host has gone to the con-

sultation room, and, after a consideration of his case, has voted, that his side was without merit. Our opinion of the bar of this State is too high for us to conclude that a man called to the high position of a judge will render an unfair or corrupt decision merely because of social courtesies extended him. Neither the acceptance nor the refusal of an invitation to dine can be considered as an evidence of such bias or friendship as to indicate a lack of judicial integrity.

But counsel for appellant rely particularly upon the allegation in the affidavit that affiant was informed, and believes and charges, that the special judge had repeatedly stated and declared to persons outside the courthouse and in private conversation that he had no doubt of the existence of a partnership between Boreing, Wilson, and Moss, "and that he had become satisfied of this fact before he had heard half of the testimony on plaintiff's application for a receiver tried last January"; that whether or not a partnership existed was a vital issue in the case, and that this issue could not be fairly and properly tried by a judge who had already formed and expressed his opinion that such partnership did exist; that the special judge stated to William Ayres, one of the attorneys for appellees, that before he was half through the presentation of his side he (the special judge) was of the opinion that a partnership did in fact exist, and that when said Ayres finished his speech he was conclusively convinced of same; that said special judge was thanked very much by said Ayres for the compliment in graceful terms. For the purpose of determining whether or not the facts above alleged are sufficient to disqualify the special judge, we must take into consideration the fact that appellees in this action, not only sought a settlement of the

partnership affairs, but asked that a receiver be appointed to take charge of the partnership property. Upon the hearing of this application, almost the same evidence was heard as upon the final submission of the case. For the purpose of determining whether or not a receiver should be appointed, the special judge heard evidence and argument upon the question whether or not a partnership existed. He concluded that there was a partnership, and, because upon this hearing he complimented the attorneys for the appellees upon their presentation of their side of the case, and also stated to various parties that he was satisfied before he had heard half the testimony, and before Ayres was half through his argument, that there was a partnership, it is contended that the special judge thereby prejudged the main issue which was thereafter to be determined in this case, and consequently became disqualified from further acting. If this were the law, then every time a judge passes upon a preliminary motion, or sustains or overrules a demurrer, thus indicating his views of the case, he would be disqualified from further sitting in the case. If appellant's contention were sound, it would then be impossible for any one judge to try a whole case. Every time he indicated his ruling upon any question involved it would be apparent that he had prejudged the case so far as that point was concerned. We cannot concur in such a view, nor can we hold that, because the special judge complimented one of the attorneys upon his able presentation of the case, he thus became disqualified from further acting in the case.

The last point relied on in the affidavit is the allegation that the special judge intended to appoint C. W. Metcalf special commissioner for the purpose of hearing proof and settling the partnership accounts; that

Metcalf was a personal enemy of appellant's father, Vincent Boreing, and was also under great obligations to appellee Moss. At the time the affidavit was filed the appointment of a commissioner had not come up for action by the court. If the special judge had really contemplated the appointment of Metcalf, there is nothing to show that he knew of the latter's disqualification by reason of his personal hostility towards Vincent Boreing. The facts stated were good reasons why Metcalf should not be appointed commissioner. These could be relied upon when the court determined to make the appointment. The allegation did not show any disqualification on the part of the special judge, but merely set forth reasons why Metcalf should not be appointed commissioner.

A careful reading of the whole affidavit leads to the conclusion that it does not come up to the requirements of the law. In German Insurance Co. v. Landrum, 88 Ky. 433, 10 Ky. Law Rep. 1039, 11 S. W. 367, 592, the rule is thus stated: "While the Legislature has said that, if an affidavit 'is made by the litigant that the judge will not afford him a fair trial, he shall not preside, the facts upon which this general averment is made must appear, and they must be such as brings the case within the legislative meaning.'" In this case no such facts are stated. The affidavit is made up of mere inferences, suspicions, and conjectures, and does not comply with the provisions of the Code as interpreted by this court. We are therefore of the opinion that the special judge did not err in refusing to vacate the bench.

Second. Did the transaction between appellees and Vincent Boreing constitute a partnership?

The record in this case consists of about 2,000 pages of typewritten matter. A large part of the evidence

vol. 128—38

is embraced in letters which passed between Boreing, Wilson, and Moss. Several disinterested witnesses gave their depositions. Wilson and Moss each testified. At the time their testimony was given, Vincent Boreing was dead. Exceptions were sustained to that portion of their testimony which related to things said or done by, or transacted with, Vincent Boreing. It was contended below that, while neither Moss nor Wilson could testify for himself, each could testify for the other. The trial court did not take this view of the case. On this appeal we are asked to review this action of the trial court, and hold that this ruling was improper. No cross-appeal, however, was prayed by, and granted to, appellees, and we therefore deem it unnecessary to determine this question.

It would extend this opinion to too great length to give anything like a brief abstract of the testimony. Suffice it to say that the writings signed by Vincent Boreing, and the letters which passed between him and Moss and Wilson, show conclusively that the contract between them was that lands along the route of the proposed extension of the Louisville & Nashville Railroad Company were to be purchased for their joint benefit; that the legal title thereto was to be taken in the name of Vincent Boreing, and held by him in trust for himself, Moss, and Wilson; that the information with reference to the proposed line of railway was to be furnished by Wilson; that Wilson and Moss were to do the greater portion of the work in connection with the selection of lands, the perfection of the titles, etc.; that the main portion of the capital necessary to finance the enterprise was to be furnished by Vincent Boreing; that before there was a division of profits the amount of money furnished by each party, with interest of not less than 7 per

cent. was to be returned. These sums were to be se-
cured by a lien on the lands. purchased. After the
sums so advanced were paid, with interest, the profits
were to be equally divided between Boreing, Moss, and
Wilson. It further appears that the business arrange-
ments thus entered into were not made for the purpose
of purchasing one track of land, but several, aggre-
gating nearly 5,000 acres. The transactions pursuant
to this arrangement were not confined to one day, one
week, one month, or one year, but extended over a
period of years. From the acts, conduct, and letters
of Moss and Wilson, it is certain that they always .
regarded the relations which they sustained to Bore-
ing and to each other as that of partners. Boreing
himself, in his letters, speaks in express terms of the
partnership that existed between them.

It is insisted by counsel for appellant that profit
sharing is not a conclusive test of partnership, but
that the real test is that of mutual agency; that the
record herein shows that Vincent Boreing did not give
to Moss or Wilson the power to represent him at all
events, but their action was always subject to review
by him; that on this account the element of mutual
agency was lacking, and therefore no partnership con-
tract existed. It is true that profit sharing is not a
conclusive test of partnership. It is still, however,
an important consideration as an item of evidence
tending to prove a partnership; for an agreement to
share profits is an essential element of every true
partnership, and, though its presence is not conclusive
that a partnership exists, its absence is conclusive that
a partnership does not exist. The reason that profit
sharing is not conclusive is that parties to a contract
may frequently agree that the compensation of one
of them shall be equal in amount to a certain propor-

tion of the profits. In such a case no partnership exists. Thus it will be seen that it is not the mere fact of profit sharing that controls, but the manner in which the profits are shared. 22 Am. & Eng. Encyc. of Law (2d Ed.), p. 3. Likewise mutual agency has been abandoned as a conclusive test of partnership; the great weight of authority being to the effect that agency as a test of partnership was unfortunate and inconclusive, inasmuch as agency results from partnership and not partnership from agency. Persons who are mutual agents in the conduct of a business and share the profits as partners are undoubtedly partners, and liable as such, and liability as a partner undoubtedly rests upon the principles of agency, and one is not a partner unless he shares the profits as a principal. But mutual agency is not a test of partnership, because the existence of such a relation is the very question in issue. The absence of power and authority on the part of one to bind his associates by his acts in the conduct of the business—that is, the absence of mutual agency—has been deemed to be conclusive that such person is not a partner. But this is incorrect. Although the absence of such power is a circumstance to be considered, it is not conclusive; for as between themselves the power of any partner to bind the firm may be limited to any desired extent.

We cannot undertake to discuss the numerous cases cited in the briefs for appellants. Each case depends upon its particular facts. After all, the intention of the parties is the controlling element. When the parties intend a co-ownership of the profits of a business, a partnership necessarily follows. But, however great the diversity of opinion among the courts, the law is well settled that where the parties, by their acts,

conduct, and writings, show that they intended a partnership, and did in fact agree to share the profits of the business as joint owners, such parties are partners.   22 Am. & Eng. Encyc. of Law (2d Ed.) pp. 27, 28.   Applying this test to the facts of this case, we are of the opinion that Boreing, Moss, and Wilson were partners, and that the trial court did not err in so adjudging.

Third.   Was A. H. Melcon, who purchased the machinery on the Tuckehoe lease, competent to testify for appellees, and did the court err in charging the estate of Vincent Boreing with the sum of $3,000 paid by said Melcon for said machinery?

A. H. Melcon testified that he paid the latter $3,000 for certain machinery which had been forfeited by the Tuckehoe Coal Company.   It is contended that this testimony was incompetent, for the reason that Vincent Boreing was dead at the time it was given, and that such testimony will establish a claim against the partnership for the machinery so purchased.   Subsection 2 of section 606 of the Civil Code of Practice provides that no person shall testify for himself concerning any verbal statement of, or any transaction with, or any act done or omitted to be done by, one who is dead when the testimony is offered to be given, except for the purpose and to the extent of affecting one who is living, and who, when over 14 years of age and of sound mind, heard such statement, or was present when such transaction took place, or when such act was done or omitted, unless an agent of the decedent, with reference to such act or transaction, shall have testified against such person with reference thereto, or be living when such person offers to testify with reference thereto.   Melcon was a party defendant to this action.   He did not testify for himself.   He

testified for the adverse party. His testimony was opposed to the interest of the estate of Vincent Boreing. Manifestly, then, so far as this provision of the Code is concerned, he was not disqualified from testifying for appellees.

But it is insisted that under subsection 7, section 606, Civ. Code Prac., which provides that "the assignment of a claim by a person who is incompetent to testify for himself shall not make him competent to testify for another," and the interpretation thereof by this court in the cases of Alexander's Ex'rs v. Alford, 89 Ky. 105, 20 S. W. 164, 12 Ky. Law Rep. 1179, and Whitlow's Adm'r v. Whitlow's Adm'r, 109 Ky. 573, 22 Ky. Law Rep. 1179, 60 S. W. 182, Melcon was incompetent as a witness. In this case, however, Melcon is not seeking to recover the machinery in question, nor has he sold or transferred it to any one else who is seeking to recover. The only question involved is: Did he pay the sum of $3,000 to Vincent Boreing for the machinery? For this purpose he testified, not for himself, or for any one to whom he had sold the machinery, but for the appellees, who were adverse parties. The fact that his testimony would be incompetent in an action to recover the machinery does not make it incompetent for the purpose for which it was given. There is nothing in the cases above referred to that conflicts with this view.

Fourth. Did the court err in charging the estate of Vincent Boreing for the 500 acres of partnership land sold by Boreing to the Bell County Coke & Improvement Company, and in fixing the sum to be charged at $20,000?

It appears from the record that Boreing sold 500 acres of the partnership property and 500 acres of his own property to the Bell County Coke & Improvement

Company in the year 1890. Prior to the time of the sale Vincent Boreing wrote to appellee Moss a letter containing the following:—

"London, Ky., January 25, 1890.

"My Dear Moss: I will be up Monday morning. You had better close with Brackett, if you can, on any terms that we can stand; also with the other parties there that we want to buy. * * * I think you will do well to give Four Mile special attention for the next day or two. My plan is to organize a company and sell them the Mrs. Green property and enough of Four Mile property to make 1,000 acres, and when that is worked we will form another Four Mile proper. My present plan is to put the Four Mile property in at $40 per acre and to stock at $100,000 and take a liberal share of the stock ourselves. I simply mention this in advance, that you may be thinking about it; but nothing to any one about the Mrs. Green purchase."

On March 25, 1890, Boreing executed and delivered title bond to the 1,000 acres in question to the Bell County Coke & Improvement Company. On the same day a meeting of the board of directors was held, and the following resolution was passed: "On motion it was ordered that the treasurer be directed to pay over to Vincent Boreing all money received by him, to an amount not to exceed $55,000, this being for purchase price of 1,000 acres of land to be deeded by said Boreing to the company; the treasurer retaining 5 per cent. (of) amount received by him for incidental expenses." At the annual meeting of the stockholders of said company, held January 13, 1903, the record of the proceedings shows the following: "Vincent Boreing hereby executes and tenders a deed of conveyance to the Bell County Coke & Improvement Company for

the 1,000 acres of land described in the title bond executed by him on March 25, 1890, as amended by resolution of the stockholders on the 22d day of November, 1902, on page 34 of the minute book of the Bell County Coke & Improvement Company, as per a calculation made by the stockholders of said company on said date (November 22, 1902), which shows a balance of purchase money due said V. Boreing of fifteen thousand eight hundred and eighty dollars ($15,880.00), with interest from the 25th day of March, 1890, at 6 per cent. per annum until paid, which is a lien upon the property described and conveyed in the deed aforesaid, and said deed is accepted by the board of directors of said company, subject to a surcharge and full settlement hereafter to be made between the said Boreing and the company aforesaid.''

A copy of the deed made by Boreing to the company on January 13, 1903, is filed with the record. It recites that the boundary conveyed contains 1,000 acres, and that the consideration is $55,000, of which sum $39,120 was paid in cash and stock issued and to be issued by said company, and a note of said company for $15,880 to said Boreing, to be paid 12 months from date of deed, with interest from March 25, 1890, at 6 per cent. per annum, which note was made a lien on the entire 1,000 acres of land. Five hundred acres of the land embraced in this deed are shown to have been partnership property. The consideration for the entire tract is put at $55,000, with no recital of a different valuation of one part of the land as compared with another. The treasurer's books of the company show that Boreing received in all about $17,000 in cash. At the various meetings of the company he had been voting 1,111 shares of stock, which were valued at

$20 per share.  This, with the balance shown by the deed to have been due, would aggregate about $55,000. It is evident from the record in this case that the appellants, having in mind the fact that their father was dead, relied upon the inability of appellees to prove the allegations of the petition with reference to the sale of the Brackett lands to the Bell County Coke & Improvement Company, as well as the price paid therefor.  Boreing, in his letter to Moss, fixed the price at $40 per acre. The deed which he executed fixed a price of $55 per acre.  We do not, therefore, think the court erred in fixing the price to be charged to Boreing's estate at $40 per acre.

But it is contended that it would be unjust to charge Boreing's estate with this amount and interest, for the reason that a portion of the purchase money, amounting to $15,880, was not shown to have been paid.  We think, however, that the record fully sustains appellees in their contention that Boreing received in stock and cash an amount in excess of $20,000, and that good faith requires that these payments so made should be applied on the debt due upon the partnership land before any application thereof is made to the land owned by Boreing individually.  22 Am. & Eng. Encyc. of Law (1st Ed.) p. 1086.  But where the firm, and also one of the partners, are creditors of the same person, the duty to exercise good faith towards his copartners requires the creditor partner to apply a general payment made to him upon the firm account.  Lindley, in his work on Partnership (second American edition, page 568, side page, 236), says: "Before leaving the subject of appropriation of payment, it may be as well to advert to a question of some difficulty which arises when a person indebted to a firm, and also to an individual

member of it, pays him a sum of money under such circumstances that it cannot be ascertained on account of which debt the payment was made. In such a case, ought the payment be applied in liquidation of the debt due to the partnership, or to that due to the individual member? Pothier says that good faith requires that the partner receiving the money should apply it proportionally to both demands. The writer is not aware of any decision on this subject; but he apprehends that, as between the partner and the debtor, the payment might be applied to either debt at the option of the partner, whilst, as betwween the partner and his copartner, good faith would require that the payment should be applied wholly to the partnership debt.'' This view has been adopted by the Supreme Court of Connecticut in the case of Russell v. Green, 10 Conn. 269. It accords with our own view upon the subject, and we are therefore of the opinion that the payments by the Bell County Coke & Improvement Company to Boreing should have been first applied to the indebtedness due for that portion of the land purchased of the partnership through its trustee, Vincent Boreing.

Nor do we think that Moss and Wilson should now be required to take the stock, or any portion thereof, which Boreing received as a part consideration of the land in question. He sold the land as if it were his own. He received the consideration as if it were his own. He thereby converted it to his own use. He kept this stock for a period of 12 years. During that time he managed and controlled it as his own. His heirs and devisees cannot at this late day insist that the appellees shall accept their portion of this stock which he should have given to them at the time the transaction took place, and which they might have

been able to dispose of to their own advantage, had they been in possession of it. There is nothing in this record to show that Wilson ever received any stock at all. It does appear that 250 shares of stock were issued to M. J. Moss. This stock was first voted in the name of Moss by Vincent Boreing. At that time Boreing had 750 shares. At a subsequent meeting of the stockholders Boreing voted 1,000 shares of stock in his own name. It does not even appear that this stock, when first issued to Moss, was in consideration of any interest he had in the land. On the contrary, it appears that the Bell County Coke & Improvement Company has since sued Moss for the subscription price of this stock. Instead of the stock being issued, then, in part consideration of the land, the company seeks to recover from Moss the subscription price. No other stock was ever issued to Moss. He cannot, therefore, be charged in this transaction with any stock that should have been issued to him in payment of his portion of the proceeds of the partnership land.

From a careful reading of the record concerning the question involved under this heading, we are convinced that the judgment below is supported by the law and the facts.

Fifth. Did the court err in charging the estate of Vincent Boreing at the rate of 8 per cent. on said sums of $3,000 and $20,000, from the time they were received by him?

While appellees contended below that the rate of interest agreed upon between them and Vincent Boreing as to advancements was 7 per cent., in view of certain letters of Boreing to the effect that 8 per cent. was the rate agreed upon, the lower court held that each of the partners should receive interest, on the advancements made by him to the firm, at the rate of

8 per cent. Neither appellants nor appellees complain of this part of the judgment. The appellants, however, insist that it is inequitable and unjust to charge the estate of Vincent Boreing with the sums received by him at the rate of 8 per cent. per annum interest. The record discloses the fact that Moss and Wilson were for years insisting upon a settlement of the partnership affairs. Each wrote numerous letters to Boreing, asking that a time be fixed when they could all meet and definitely determine and fix the interest of each in the partnership property. For some reason or other, no such meeting was ever had, and no settlement was ever made. It also appears from the record that, aside from one or two insignificant sums, Vincent Boreing never charged himself with any money received by him, although he kept an accurate account of all disbursements or advancements made by him. Counsel for appellants insist that the estate of Vincent Boreing should not be charged any interest at all, or, if charged interest, the rate should not be higher than 6 per cent., or the moneys received by him should be applied according to the partial payment rule. The right of the partners in this case to interest on advancements does not depend upon any settlement or accounting fixing a balance due by any one of the partners to the firm, but upon the fact that it was especially embraced in the contract of partnership. Manifestly it would be inequitable and unjust to allow a partner 8 per cent. interest on advancements and not charge him a like rate on the sums received by him. To do so would be to put a premium upon delay. The partner receiving interest on advancements could, by prolonging the day of settlement, secure an unjust and unfair advantage of the other members of the firm. In our opinion, this is

not a case of lender and borrower, or creditor and debtor. Boreing agreed to advance from time to time such sums as were needed for the purchase of the land and the expenses of the enterprise in the way of taxes, surveying, etc. It is admitted that he made such advancements, and his estate is now claiming interest on them from their respective dates. It also appears that he received large sums of money from time to time from the sales of the land and timber and other sources. In this way he had an account with his firm for the advancements made, and his firm had an account with him for the receipts which came to his hands from the above sources. This being the case, the entire transaction was one of mutual accounts, and must be dealt with as such, and not in the mode prescribed in the statute in the case of a mere creditor and debtor.

In the case of Farmers' & Shippers' Leaf Tobacco Warehouse Co. v. Head & Switzer, 29 Ky. Law Rep. 328, 93 S. W. 17, this court said: "The transactions between the parties involved $100,000. They covered a period of 10 years—from 1894 to 1903, inclusive. There had never been a settlement between them. It is not contended but that appellees shipped to appellant and its predecessors all the tobacco bought by them with the means advanced to them. The tobacco was supposed to be sold for an increased price generally. Appellees were led to believe that the venture was making some money. They claim to have not kept books, but relied on appellant's books to show the transactions. Taking appellant's books as the basis of settlement, and applying the facts, showing the agreement between the parties, to the rules of law that should obtain, we cannot say that the chancellor erred in his conclusions. The apparent large discrep-

ancy of $10,000 may be accounted for by at least two
classes of items about which the parties widely differ
—one of interest; the other of commissions to appel-
lees on shipments to appellant. Appellant (and we
include its predecessor, whose affairs were all taken
over by appellant) charged appellees interest usually
from the time loans were made till sales were made,
when the proceeds of sales were credited and the
balance taken as a new principal, on which interest
was counted till another sale, and so on. As sales were
being made nearly every week, it thus came about that
appellant was indulging a system of compounding in-
terest that was ruinous to the debtors. The more
frequently they made small sales, or it made them for
them, the harder the compounding of interest became.
We think interest should have been counted on the
sums advanced by appellant at 6 per cent. per annum,
and appellees should have been credited by interest
at the same rate on proceeds of sales made for them
by appellant from dates of sales. The loans were not
for a definite term or period. The sales were not by
agreement applied to any particular loan. The mutual
running accounts should have been treated on the
same basis. There was nothing in the arrangement
between the parties that justified the warehousemen
getting all the interest. It was not a case of partial
payments, but was one of mutual accounts of equal
rank.'' The facts of the case at bar are very anal-
ogous to the facts in the above case. The advance-
ments made by Boreing were not for a definite time,
and were made to the firm of which he was a member.
The proceeds of sales of land and timber and the col-
lection of rents by him were not applied, and in the
nature of the case could not be applied, upon any par-
ticular item of advancement, but constituted an ac-

count br `ween Boreing and the partnership, showing the amounts for which he should account to the firm. Upon the one sid`, is the running account of advancements made; on the other side is the account of moneys received from the proceeds of the sales of partnership property made by Boreing as trustee for the partnership. Thus it is not a case of partial payments, but one of mutual accounts of equal rank.

But counsel for appellants contend most earnestly that the deed from Boreing to the Bell County Coke & Improvement Company shows that $15,880 of the purchase money was a deferred payment bearing 6 per cent. interest from the 25th day of March, 1890, and that it is improper to charge Boreing's estate with 8 per cent. on the money received by him, when the deed shows that a portion of the purchase price has not been received, and his estate is only entitled to 6 per cent. interest on the deferred payment. As said before, however, Boreing received in cash and stock more than sufficient to pay for the 500 acres of partnership property included in the 1,000 acres conveyed by him to the Bell County Coke & Improvement Company, and it was his duty first to apply the payments so made to the liquidation of the partnership debt. While as between the Boreing estate and the Bell County Coke & Improvement Company, the lien to secure the deferred payment of $15,880 and interest is upon the entire 1,000 acres of land, in so far as it affects the settlement of this partnership, the lien covers only the land owned by Boreing individually; he having received the full value of the partnership property, which should have been applied to the payment of the debt due the partnership.

Sixth. Did the lower court properly overrule the motion of appellants to set aside those portions of the

judgment respecting said items of $3,000 and $20,000, and to refer to the commissioner for further proof?

Counsel for appellants complain most earnestly of the action of the trial court in singling out the two items of $3,000 and $20,000, and passing upon those questions, instead of referring them to the commissioner for the purpose of hearing proof and reporting thereon. They insist that the trial court should have awarded them a new trial, not only on this ground, but because of the facts alleged in certain affidavits and contained in the deed of Vincent Boreing to the Bell County Coke & Improvement Company dated May 3, 1890, purporting to convey a certain boundary of land, whose area is not stated, in consideration of $25,000, of which $12,500 was paid and $12,500 was to be paid in 12 months from March 1, 1890. We have carefully read the affidavits pro and con, and are of the opinion that the questions relating to the $3,000 and $20,000 transactions were taken up, heard, and discussed by the trial court with the distinct understanding that he should then and there pass thereon. Besides, the order of submission shows that the case was submitted on exceptions to certain depositions and "for hearing and trial in chief." Under these circumstances, without such an agreement and understanding between counsel for appellants and appellees, the trial court would have been justified in passing upon the questions referred to. It is quite evident from the record that the appellants were at all times relying upon the fact that, Vincent Boreing being dead, it would be impossible for appellees to establish their contentions. There is nothing to show that the evidence referred to in their affidavits in support of their motion for a new trial could not have been secured in time for the final hearing. The deed referred to was on record,

and a copy thereof could have been readily secured. No good reason is shown why it was not secured in time for the hearing. Besides, the affidavit of R. C. Ford, who lived in Pineville, and whose deposition could readily have been taken, tends rather to support the conclusion reached by the trial court. He says that "the price was to be $55,000 for 1,000 acres, and was sold by the acre, and, if land fell short, then V. Boreing was to rebate at rate of $55 per acre for such shortage." This does not show that any higher price was placed upon one acre than upon another. With this affidavit before him, the court could not help reaching the conclusion that, in fixing the value of the land at $40 per acre or $15 per acre less than this affidavit shows was the agreed price, he made no error in favor of appellees. The deed in question, it is claimed, covered only 125 or 150 acres of the land sold to the Bell County Coke & Improvement Company. It is the contention of appellants that the remaining 850 or 875 acres are shown by this deed to have been valued at $30,000. The deed cannot, however, be regarded as conclusive of the value fixed. It is not shown that either Moss or Wilson had any knowledge of its provisions at the time it was executed, and certainly it was not binding on them. Besides, the affidavit of Ford completely nullifies the recitals of the deed. We are of the opinion, therefore that the trial court did not err in refusing to grant a new trial, and again referring the case to the commissioner to take further proof in regard to the items of $3,000 and $20,000.

Upon a case involving so many questions of law and fact, and consisting of such a voluminous record, we think the trial court displayed admirable judgment in the conclusions he reached. After a careful exami-

vol. 128—39

nation of the entire record, we are of the opinion that it contains no error prejudicial to the substantial rights of the appellants. Wherefore the judgment is affirmed.